UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| ROYCE LOVE, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | CAUSE NO. 3:15-CV-214-CAN |
|  | ) |  |
| CITY OF SOUTH BEND, INDIANA, | ) |  |
| *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

**OPINION AND ORDER**

On March 3, 2016, Defendants filed their Motion for Summary Judgment. On March 16, 2016, Plaintiff, Royce Love, filed his response in opposition. On April 4, 2016, Defendants filed their reply. The Court issues the following opinion resolving Defendants' motion as discussed below pursuant to the consent of the parties and 28 U.S.C. § 636(c).

In their motion, Defendants seek summary judgment as to all claims raised by Love in this case. Love's claims arise from the alleged use of excessive force against him during an arrest following a multi-vehicle police chase through the streets of South Bend, Indiana in the early morning hours of August 4, 2013. Through the instant action under 42 U.S.C. § 1983, Plaintiff raised Fourth and Fourteenth Amendments claims of excessive and unreasonable use of force against the South Bend police officers involved in the arrest (Count I) and municipality liability under *Monell* against the City of South Bend (Count II). For the reasons stated below, the Court denies Defendants' motion as to Count I and grants Defendants' motion as to Count II.

**I.     RELEVANT BACKGROUND**

The following facts are primarily not in dispute. Where the facts are in dispute, this Court has determined that the disputes are either not material or has chosen to address such disputes in the Court's substantive analysis of the issues.

While on duty at approximately 4:15 a.m. on August 4, 2013, Defendant South Bend Police Officer Christopher Deak and another officer attempted to stop a white van, determined later to be driven by Love, at about the 2100 block of South Marine Street in South Bend. The van did not stop, however, causing Deak and the other officer to initiate a vehicular pursuit that they reported to the police department via radio. Hearing the radio call, Defendant Officer Erik Schlegelmilch drove his police vehicle south on Miami Street from Lincolnway East to assist in the pursuit. Deak then advised over the radio that the pursuit was approaching Miami Street while on East Indiana Avenue. Before Schlegelmilch could deploy stop sticks—a tire deflation device, he observed the van turn north on Miami. He continued to pursue the van, and then requested over the radio that he be the primary pursuit vehicle because he was "Pursuit Intervention Technique ("P.I.T.") certified."

Schlegelmilch followed the van as it turned west on Lincolnway East. Defendant Officer Joseph Cole joined the pursuit on Miami. Defendant Officer Michael Stuk, who was also P.I.T. certified, joined the pursuit directly behind Schlegelmilch. Schlegelmilch and Stuk attempted a rolling road block on Lincolnway East as they went under the Eddy Street overpass. However, the van eluded the roadblock by swerving and crashing into Stuk's patrol car without stopping.

Officers attempted another rolling roadblock on Lincolnway East and East South Street with no success. Schlegelmilch also tried a different P.I.T., which involved pulling alongside the van with the front of his vehicle, making contact with the van near the rear wheels, and steering

into the van trying to get it to swerve sideways. His efforts failed and the pursuit continued on Lincolnway East.

Officer Greg Howard also deployed spike strips at the intersection of East Monroe Street and South Michigan Street. The van ran over the strips damaging both passenger side tires, but continued turning north on South Lafayette Boulevard. The van stopped briefly at the West Western Avenue intersection before continuing north. Schlegelmilch attempted another P.I.T., but the van was moving too slow for it to work.

In the mean time, Defendant Officer Larry Sanchez, with his canine partner Bacca, had joined the pursuit near the intersection of Monroe and Michigan. The van turned west on West Wayne Street and made a quick turn north into an alley. After driving approximately 200 feet in the alley, the van stopped behind the address of 222 South William Street—Love's home.

Defendant Officer Jonathan Gray had joined in the police pursuit near the intersection of South Lafayette Boulevard and West Western Avenue, but stayed back initially to help with a perimeter because so many officers were already in pursuit. A short time later, Gray heard that the van had stopped and ran over to help.

The facts of Love's conduct after the vehicle stopped are largely contested. In general, Love contends that he complied fully with the officer's commands to lay down flat on his stomach on the ground with his hands out to the side and made every effort to surrender peacefully. Defendants, on the other hand, allege that Love only dropped to his knees and was never fully compliant despite being surrounded by multiple officers pointing firearms at him, being Tasered, and being held by the police dog. Defendants also claim that Love's aggressive behavior escalated throughout the incident and included pulling out Taser wires, attempting to

3

stand, shouting at officers, and resisting the dog's hold on his arm by choking the dog as well as biting and punching the dog's head. Love, by contrast, alleges that the officers used excessive and unreasonable force by Tasering him, releasing the dog to attack him, and punching him in several areas of his body including his head while he peacefully surrendered.

Love was ultimately handcuffed and treated on the scene by medics before being transported to the hospital for dog bite wounds. Love had to be restrained at the hospital during his treatment. He continued to resist while being treated and while being booked at the St. Joseph County Jail. In addition, Love's blood alcohol count measured .21.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*,

4

200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted).

> **B. A genuine dispute of material fact exists precluding summary judgment on Love's excessive force claim against Defendants Schlegelmilch, Gray, Cole, Wright, Stuk, Sanchez, Deak, and Blilinski (collectively "the Officers").**

In Count I, Love claims that the Officers used excessive force against him in violation of his rights under the Fourth Amendment. The Fourth Amendment guarantees the right of individuals to be free from unreasonable searches and seizures and was made applicable to State actors through the Fourteenth Amendment. *Terry v. Ohio*, 392 U.S. 1, 8 (1968). Plaintiff brings this claim pursuant to 42 U.S.C. § 1983, which is not a source of substantive rights but "is a means for vindicating federal rights elsewhere conferred." *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Excessive force claims are reviewed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). When determining whether a particular use of force is "reasonable" under the Fourth Amendment, a court must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396. The right of a law enforcement officer to make an arrest "necessarily carries with it the right to use some

5

degree of physical coercion or threat thereof to effect it. *Id.* Indeed, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal citations and quotations omitted).

A court analyzes the force used against a suspect from the perspective of an officer under the circumstances, rather than evaluating the officer's actions with the benefit of hindsight. *Id.* In its analysis of the reasonableness of an officer's actions, a court must give careful attention to the facts and circumstances of the case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* In considering the totality of the circumstances, a court may also consider "whether the [individual] was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (quoting *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000) (other quotations and citations omitted)). A court's ultimate goal in examining these factors is to determine "whether the force used to seize the suspect was excessive in relation to the danger he posed . . . if left unattended." *Id*.

On motion for summary judgment, "the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's actions," if sufficient undisputed material facts exist "to establish that the officer acted reasonably under the circumstances." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). Yet in this case, material facts about the reasonableness of the Officers' conduct in light of the totality of the circumstances are contested, thus precluding summary judgment on Count I.

The Officers contend that Love evaded vehicular pursuit by multiple police officers and refused to follow the Officers' instructions when he finally stopped and exited the van. The Officers also claim that Love did not heed warnings about escalated force leaving them with no choice but to employ Tasers and a dog hold. Furthermore, the Officers describe aggressive behavior by Love in reaction to both the Tasers, which allegedly failed to stop or slow Love, and the police canine hold. The Officers allege that Love's attack on the dog then required them to hit and kick Love to contain him and rescue the dog.

If these facts were undisputed, the Officers would likely be entitled to judgment as a matter of law. Seen from the Officers' perspective, the escalation of Love's conduct from evading police while driving his van, to refusing to lie down and spread his arms, to aggressively ripping out the Taser wires, and to choking, biting, and punching the police dog would create a situation where an escalation of force, including Tasers, a dog hold, and direct attack could be objectively reasonable. Indeed, the Officers allege that Love's conduct reasonably caused them to fear for their safety because they had not determined whether Love was armed, whether there were other hazards remaining in the van, and how to gain control of Love's unusual behavior to eliminate any threat that may be posed to themselves or others nearby.

Love, however, vehemently disputes this interpretation of the facts and circumstances surrounding the incident despite agreeing with some of the Officers' facts. For instance, Love does not dispute that he continued driving his van from South Marine Street to his home on William Street with officers following him with their lights and sirens activated. He also does not dispute that he had to be restrained at the hospital while being treated for the injuries he

7

sustained during the incident. Similarly, he does not dispute that this blood alcohol count measured .21. He does, however, dispute everything else the Officers claim occurred.

Love contends that once he stopped his van at his home, he obeyed all the Officers' commands and attempted to peacefully surrender himself into their custody. In his sworn statement, Love states that he threw his car keys to the ground as ordered; exited his vehicle as ordered; and went down flat on the ground with his arms spread out as ordered. Doc. No. 18 at 1, ¶ 4. He further avers that after placing himself on the ground, the Officers yelled and cursed at him. Love claims he was lying on the ground passive and compliant when the Officers deployed Tasers on him then released a police dog allowing it to attack and bite him. Love also states that the Officers began punching him in several areas of his body, including his head, while he was being Tasered and attacked by the dog. *Id.* at 1–2, ¶ 5. Love states that the Officers continued to assault him despite his efforts to apologize and surrender peacefully without using any physical or verbal force against the police at any time. *Id.* at 2, ¶¶ 6, 9.

Accordingly, Love paints a completely different picture of the Officers' conduct on August 4, 2013. If Love's version of the facts is correct, a jury could conclude that the Officers' conduct was objectively unreasonable in light of Love's passive and compliant conduct. And it is Love's version of the facts that this Court must view most favorably in determining whether summary judgment is warranted. As a result, the question of the objective reasonableness of the Officers' use of force against Love poses a quintessential genuine dispute of material fact that this Court cannot ignore. The outcome of Love's Fourth Amendment excessive force claim against the Officers in Count I of his complaint is completely dependent on a determination of the facts of Love's conduct, which the parties perceive in completely opposite ways. Therefore,

this Court cannot determine as a matter of law that the Officers' acted reasonably under the circumstances precluding summary judgment.

      **C.     The Officers are not entitled to qualified immunity for the excessive force claim against them because a genuine dispute of material fact exists as to the circumstances of Love's arrest.**

Qualified immunity protects government officials, including police officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The test for qualified immunity is "whether the law was clear in relation to the specific facts confronting the public office when [he or she] acted." *Green v. Carlson*, 826 F.2d 647, 649 (7th Cir. 1987); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

In deciding whether a defendant will enjoy qualified immunity, courts must determine: "(1) whether the plaintiff has asserted a violation of a federal right, and (2) whether the constitutional standards implicated were clearly established at the time in question." *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) (citations omitted). The first issue is a threshold one. *Scott v. Harris*, 550 U.S. 372 (2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Once that threshold is met, the plaintiff bears the burden to demonstrate that the law establishing the right was clearly established at the time of the incident. *White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002); *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988). However, at the summary judgment stage of litigation, a "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits" creates a genuine dispute of material fact that cannot simultaneously justify qualified immunity for the public official who allegedly violated a

constitutional right. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435–36 (7th Cir. 1993); *see also Green*, 826 F.2d at 652 ("[I]f there are issues of disputed fact upon which the question of immunity turns, . . . the case must proceed to trial."); *Nieto v. City & Cty. of San Francisco*, No. 14-CV-03823 NC, 2015 WL 7180609, at *6 (N.D. Cal. Nov. 16, 2015) (distinguishing *Mullenix* and finding it premature to grant summary judgment on grounds of qualified immunity when material facts remain disputed).

Here, Defendants argue that the Officers are entitled to qualified immunity because Love failed to demonstrate that the law was clearly established at the time of the incident. Defendants focus on the Seventh Circuit's approach for addressing qualified immunity, which advises:

> Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law.

*Landstrom v. Ill. Dep't of Children & Family Servs.*, 892 F.2d 670, 675 (7th Cir. 1990) (quoting *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.1988) (en banc), *cert. denied,* 488 U.S. 968 (1989)). The Seventh Circuit has affirmed summary judgment on the basis of qualified immunity in a case where the plaintiff provided no case law relevant to the specific facts and circumstances involved in the incident at the center of their cases. *See, e.g.*, *Zimmerman v. Doran*, 807 F.3d 178, 182–84 (7th Cir. 2015). And just as Defendants allege, Love has not provided any case law to show that subduing a fleeing person with Tasers or a police dog violates a clearly established right.

Defendants' analysis, however, is premature. The facts as to whether Love was fleeing and whether the Officers' conduct in subduing him was objectively reasonable have yet to be

decided, and will not be decided on summary judgment. And the case law necessary to demonstrate a clearly established right will be completely different if Love was peacefully surrendering as he avers rather than being aggressive and out of control as Defendants contend. As a result, this case presents an overlap between the issues in the qualified immunity analysis and the principal substantive question of objective reasonableness raised in Love's excessive force claim. The genuine dispute of material fact that precluded summary judgment on Love's excessive force claim also precludes qualified immunity for the Officers at this time.

> **D. The City of South Bend is entitled to judgment as a matter of law on Love's municipal liability claim raised pursuant to *Monell*.**

There is no *respondeat superior* liability under Section 1983. *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014). Acts of a municipality are distinguishable from acts of its employees. *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011) (citations omitted). In order to state a cognizable Section 1983 municipal liability claim, a plaintiff must allege a direct causal link between an unconstitutional governmental policy or custom and the alleged constitutional deprivation. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690–94 (1978). Merely attributing conduct to the municipality is not enough. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). A plaintiff must also demonstrate that the municipality's deliberate conduct was the "moving force" behind plaintiff's alleged constitutional injury. *Id.* In other words, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

To justify liability, the allegedly unconstitutional conduct of the municipality, and not that of its employees, must implement or execute "a policy statement, ordinance, regulation, or

decision officially adopted and promulgated by that body's officers." *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 36 (2010) (quoting *Monell*, 436 U.S. at 690–91). A municipality can also be sued for "deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's office decisionmaking channels." *Id.* Therefore, to establish the necessary causation, a plaintiff must allege

> an express [municipal] policy that, when enforced, causes a constitutional deprivation; . . . a widespread [municipal] practice, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law; or [that the] plaintiff's constitutional injury was caused by a person with final policymaking authority.

*McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

Here, Love asserts that the City has both municipal policies and widespread municipal practices constituting customs or usages within the force of law that allegedly caused his alleged constitutional injuries. Doc. No. 17 at 6. Specifically, Love alleged in his complaint a widespread practice of deliberate indifference to known instances of police use of excessive and unreasonable force; routine efforts to discourage citizens who attempt to report instances of police misconduct; a policy of diverting citizen complaints from the Office of Internal Affairs to shift supervisors in order to prevent full and fair investigation of citizens' complaints; a policy of preventing adequate investigations into citizen complaints of police misconduct; and failure to take adequate corrective measures when made aware of individual instances of its officers engaging in the use of excessive force. Doc. No. 2 at 3–4, ¶¶ 21–27.

To establish an express municipal policy, Love must identify a written policy or point to an express conduct of the City of South Bend he believes to be constitutionally deficient. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). To establish a

12

widespread unwritten municipal custom or practice leading to a violation of constitutional rights, Plaintiff "must allege a specific pattern or series of incidents that support the general allegation of a custom or policy." *Hollins v. City of Milwaukee*, 574 F.3d 822, 827 (7th Cir. 2009). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007).

Defendants contend that Love did not allege a written or express policy that permits excessive force in the City of South Bend, or that is constitutionally deficient. Defendants argue that the Police Department's allegedly inadequate investigation of the Love incident, its failure to take disciplinary measures after the incident, and its discouragement of citizens from reporting police misconduct after an incident all occurred after the Love incident and cannot create the causal link required to support municipal liability.

To a degree, Defendants are correct. Love has not identified a written or express policy that permits excessive force in the City of South Bend, or that is constitutionally deficient. In addition, police conduct or practices after the Love incident occurred cannot establish the necessary causal link. Yet, Love alleges more than just policies and practices initiated after the Love incident. Even if no express policy can be identified, Love alleges that the police department engaged in widespread practice of constitutionally deficient conduct that set the stage for the allegedly excessive and unreasonable force used against him. Therefore, Defendants arguments for summary judgment on the issue of municipal liability are not persuasive. Nevertheless, summary judgment on Love's claim against the City of South Bend is still warranted because Love's allegations alone are not enough to overcome summary judgment.

13

"Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted). Love has presented no evidence to support his allegations that these practices existed, were intentional, or guided the conduct of the Officers when arresting Love in August of 2013. As such, the factual record before the Court does not convince the Court that a rational jury would find in his favor on his municipal liability claim. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

Love blames the City of South Bend for his lack of evidence in support of any policy or practice of excessive and unreasonable force. In his response brief filed fifteen days after the close of discovery, Love asks the Court to deny summary judgment and, for the first time, to compel the City of South Bend to produce responses to his discovery requests served on July 23, 2015, which Love contends were never objected to and to which he has received no responses. Yet Love failed to raise this discovery issue in a timely manner. Indeed, Love knew about the City's discovery deficiencies for about eight months before filing his response to Defendants' motion for summary judgment where he raised his discovery problem for the first time.

Moreover, Love has not demonstrated that he made any effort to meet and confer with the City to resolve the discovery dispute. *See* Fed. R. Civ. P. 37(a); N.D. Ind. L.R. 37-1. As a result, the Court has no reason to believe that Love even attempted to resolve this apparent discovery dispute without the Court's assistance. Love's request to compel the City to produce discovery responses also fails when considered a request for discovery under Fed. R. Civ. P.

56(d) because he has not filed an affidavit or declaration delineating specific reasons why it cannot produce evidence in support of its municipal liability claim against the City.

It is a plaintiff's responsibility to prosecute his own case. If a plaintiff chooses not to chase down discovery responses in a timely manner despite having sufficient procedural mechanisms available to do so, he does so at his own risk. Here, Love's strategic decision to wait eight months until after the close of discovery and after a dispositive motion was filed before attempting to gather tardy discovery responses amounts to undue delay.

Even if the Court was willing to consider Love's procedurally deficient request, Love has made no compelling substantive arguments that there is good cause to compel the discovery responses. Therefore, Love's own failure to use the rules of civil procedure to secure discovery responses now prevents him from presenting any evidence of municipal liability. Without such evidence, Love has not presented any genuine dispute of material fact regarding municipal liability and so the City is entitled to judgment as a matter of law.

### III. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. [Doc. No. 13]. The Clerk is **INSTRUCTED** to enter judgment in favor of Defendant, the City of South Bend, on Love's municipal liability claim (Count II). Love's excessive force claims (Count I) against Defendants Schlegelmilch, Gray, Cole, Wright, Stuk, Sanchez, Deak, and Blilinski will proceed to trial.

Therefore, in light of the Court's ruling, the Court now **SETS** a telephonic scheduling conference for **August 30, 2016, at 11:30 a.m. E.D.T.** to select an appropriate trial date. The Court will call all counsel listed on the docket sheet unless it is notified that specified attorneys

need not be contacted.  If, at the time of the scheduled conference, any counsel will not be at the telephone number identified on the docket, please contact chambers.

**SO ORDERED.**

Dated this 7th day of July, 2016.

S/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge